THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRENDA L. WEBSTER, | ) | 4:08CV3113 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This is an appeal from the decision of the Commissioner of Social Security that plaintiff Brenda L. Webster is not disabled within the meaning of the Social Security Act ("Act"), and is therefore not entitled to disability insurance benefits or supplemental security income benefits under Titles II and XVI[1] of the Act. The Commissioner's decision will be reversed and the cause remanded for further proceedings.

## I.  BACKGROUND

Plaintiff's applications for disability benefits under Titles II and XVI of the Act were denied initially and on reconsideration. (Tr. 938-942, 945-949, 966-968, 1274-1278.) On October 18, 2006, an administrative law judge ("ALJ") issued a decision finding that Plaintiff was not under a "disability" within the meaning of the Act. (Tr. 28-43.) On April 7, 2008, the Appeals Council of the Social Security Administration denied Plaintiff's request for review. (Tr. 19-22.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1]Because "[t]he same analysis determines disability under Title II and Title XVI," *House v. Astrue*, 500 F.3d 741, 742 n.2 (8th Cir. 2007), this memorandum and order shall not separately analyze the plaintiff's claims under each of these titles.

The ALJ's decision included the following findings:

1.   The Claimant met the special earnings requirements under Title II of the Social Security Act, as amended, on November 27, 2003, the date she stated she became unable to work, and continued to meet them through December 31, 2004, but not thereafter.

2.   The Claimant has not performed substantial and gainful work activity since November 27, 2003.

3.   The record establishes that the Claimant has the following medically determinable impairments which have imposed more than slight limitations upon her ability to function: fibromyalgia, obesity, depression superimposed on a dependent personality disorder and a post-traumatic stress disorder, and a history of spastic gait and an essential tremor of the hands.  In addition, she has been evaluated and treated for chronic sinusitis, possible sleep apnea, erosive esophagitis, episodic gastritis; however, these conditions have resulted in only short-lived or temporary functional restrictions and, as such, are non-severe impairments within the meaning of 20 CFR 404.1521 and 20 CFR 416.921.

4.   The Claimant's medically determinable impairments, either singly or collectively, have not revealed the same or equivalent attendant medical findings as are recited in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4.  With specific regard to her emotional illness, there have been only mild restrictions in her activities of daily living, moderate limitations in her ability to maintain social functioning, moderate limitations in her ability to maintain concentration, persistence and pace, and no episodes of decompensation of extended duration.

5.   While her combined impairments have imposed limitations upon her ability to perform basic work-related functions, the Claimant can frequently lift/carry items weighing up to 10 pounds; sit for 6 hours during an 8-hour workday; stand/walk for up to 2 hours in an 8-hour workday; and consistent with the limitations set forth by

2

the DDS medical consultant in Exhibit C3F, occasionally perform postural activities including climbing, bending, stooping, squatting, kneeling, crouching and crawling; and use her hands for reaching, handling, fingering and feeling. However, she is limited to low stress work that involves only brief and superficial interaction with others including the general public, and should avoid exposure to vibrations, temperature extremes and other environmental irritants.

6.     In view of the above, the Claimant is unable to perform her past relevant work as a nurse's aide, motel housekeeper and sewing machine operator/seamstress.

7.     Notwithstanding the exertional and non-exertional limitations resulting from her medically determinable impairments, the Claimant possesses the residual functional capacity for other work that exists in the regional economy in significant numbers.

8.     The Claimant's testimony, insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529 and 20 CFR 416.929, Social Security Ruling 96-7p, and Polaski v. Heckler, supra.

9.     Accordingly, the Claimant is not disabled, as that term is defined under the Social Security Act, as amended.

10.     The Claimant is not entitled to a period of disability or to the payment of disability insurance benefits under Title II of the Social Security Act, as amended.

11.     The Claimant is not eligible for the payment of supplemental security income benefits under Title XVI of the Social Security Act, as amended.

(Tr. 41-42.)

## II.  ISSUES ON APPEAL

3

The Social Security Administration uses a five-step process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520 & 416.920.

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the RFC [residual functional capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted). In this case, and as stated above, the ALJ reached step five of the sequential analysis, concluding that plaintiff Webster is not disabled.

Webster argues that the ALJ's decision should be reversed because the ALJ (1) improperly evaluated Webster's credibility and (2) assigned improper weight to various physicians' opinions. Specifically, Webster submits that the ALJ erred (1) in improperly evaluating Webster's credibility regarding her subjective complaints of pain and depression; (2) in failing to assign controlling or "the greatest weight" to the opinions of Webster's treating physicians in making a residual functional capacity ("RFC") assessment; and (3) in failing to either follow, or properly discredit, the opinion of the state-agency medical consultant who evaluated Webster's mental condition and opined that Webster would be moderately limited in her ability to deal with most circumstances encountered in the work setting. (Filing 1, at 2; Filing 16, at 27-28.)

4

### III.  STANDARD OF REVIEW

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. *Hogan v. Apfel*, 239 F.3d 958, 960 (8th Cir. 2001). "Substantial evidence" is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. *Id.* at 960-61; *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001).

This court must also review the decision of the Commissioner to decide whether the proper legal standard was applied in reaching the result. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed de novo. *Olson v. Apfel*, 170 F.3d 820, 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n.2 (8th Cir. 1995).

### IV.  SUMMARY OF RECORD

Plaintiff filed her applications for disability benefits under Titles II and XVI on February 26, 2004. (Tr. 966-68, 1274-76.) She stated that she was born in 1958 and alleged that she became disabled beginning November 27, 2003. (Tr. 966.) In her Disability Report, Plaintiff alleged disability due to rheumatoid arthritis, fibromyalgia, falling asleep while driving, a swallowing disorder, anxiety, panic attacks, depression, sleep apnea, chronic sinus infections, migraine headaches, eye problems, throat problems, and a hiatal hernia. (Tr. 970.)

The relevant medical evidence shows that during Plaintiff's initial appointment at O'Neill Family Practice, she mentioned that she was trying to obtain disability

5

benefits, and the doctor wrote that he was "very blunt with her with [his] concern that she is actually quite physically healthy [and] should not be attempting to get disability as she is certainly able to perform a job." (Tr. 1264.)

Throughout the relevant period, Plaintiff received treatment from family practitioners Jay Allison, M.D., and Byron Bigham, M.D., for impairments such as chronic sinusitis, possible sleep apnea, erosive esophagitis, episodic gastritis, depression, generalized anxiety, and fibromyalgia. Her fibromyalgia was manifested by tenderness and was treated with medication. Her depression and anxiety were treated with medication as well. (Tr. 1104-40, 1191-97, 1258-67.)

On December 11, 2003, Plaintiff saw Gordon Bainbridge, M.D., with complaints of residual problems from an old left ankle injury. (Tr. 1099.) Examination showed some tenderness, but no swelling or effusion. Plantar flexion was "good," and she had "good" motion of the subtalar and tarsometatarsal joints. X-rays were "very normal." Dr. Bainbridge assessed a chronic left ankle sprain and prescribed conservative treatment including a home exercise program. (Tr. 1098-99.) Plaintiff returned on March 18, 2004, at which time Dr. Bainbridge administered an injection of local anesthetic and steroids into the peroneal tendons and changed his assessment to left ankle sprain with peroneal tendinitis. (Tr. 1097.)

On April 24, 2004, Plaintiff saw Keith A. Willis, Ph.D., for a consultative examination. (Tr. 1141-48.) Plaintiff was cooperative throughout the interview; she spoke slowly and deliberately and was oriented as to time, place, and person. (Tr. 1141, 1144.) She recalled that she had previously completed an evaluation with Dr. Willis a few years prior in conjunction with a previous application for benefits; however, she "thought it occurred last year when it actually was about December of 2000." (Tr. 1144-45.) She denied a history of hallucinations, her affect was "fairly" flat, and she "seemed to be rather depressed." (Tr. 1145.) Her self worth was "very low," and Dr. Willis noted that she may have some difficulty with her memory, as she

6

lost track of what she was saying once during the interview and appeared to give up trying to remember.  (Tr. 1145.)

Plaintiff reported that she prepared her own meals, but had someone come clean her house.  She stated that she enjoyed watching television and movies, playing computer games, and making crafts.  She said that her sleep had been poor until recently when she obtained a continuous-positive-airway-pressure machine.  She reported having some companionship with others, including a friend who visited her "fairly often," and she said that she sometimes babysat for her friend's infant son.  She also attended church, spoke with her pastor on the telephone, and visited neighbors. (Tr. 1145.)  Dr. Willis opined that Plaintiff would be able to understand, remember, and carry out short and simple instructions and relate appropriately with co-workers and supervisors.  He opined that she would not be able to sustain concentration and attention needed for task completion or adapt to changes in her environment.  (Tr. 1148.)

On April 29, 2004, Plaintiff saw Larry Birch, M.D., for a physical consultative examination.  (Tr. 1149-54.)  Examination showed Plaintiff was "very" pleasant and her speech was "normal."   (Tr. 1150.)   Dr. Birch noted that throughout the examination, she had "various unusual shaking or twisting at different body parts and not really truly consistent with any organic tremor or seizure problems and appears to be more likely psychological in nature." (Tr. 1150.)  She was morbidly obese, but her joints did not show any distortion from chronic rheumatoid arthritis or active synovitis.  Examination of her wrists, elbows, shoulders, hips, knees, and ankles were all "normal."  She walked with a "funny waddling type gait that varies depending on how well she is distracted."  Heel and toe walking was "fair," and her ability to squat was "fair."  She was able to get on and off of the examination table, turn from supine to prone, sit up, and lie down.  (Tr. 1151.)  Straight-leg-raise testing was negative, and she had an essentially full range of motion in all joints.  (Tr. 1153-54.)  Her grip strength was "3/5," but her pincer strength was "excellent," and she was able to

normally manipulate coins.  Dr. Birch opined that although Plaintiff alleged having rheumatoid arthritis, he could not find any evidence to support a finding of any active or past history of the disease.  (Tr. 1151.)  Dr. Birch observed that while she did have some fibromyalgia symptoms, there were no objective findings at that time.  Finally, Dr. Birch noted that Plaintiff's visual acuity with correction was "20/25" with both eyes, and that her "tremor" appeared more likely to be anxiety-driven, rather than "organic disease."  (Tr. 1152.)

On May 24, 2004, John Curran, Ph.D., performed a second consultative psychological evaluation.  (Tr. 1155-56.)  Plaintiff was dressed cleanly and casually, and her grooming and hygiene were adequate.  Webster was oriented as to person and place, but only partially as to time; she knew it was May 2004, but incorrectly believed it was May 26, 2004.  Plaintiff could not accurately recite her Social Security number from memory.  She was "mostly" somber, but was cooperative, calm, and focused.  Dr. Curran administered the Wechsler Memory Scale-III, which showed Plaintiff had memory "difficulties" and "deficiencies."  (Tr. 1155.)

On June 25, 2004, Plaintiff saw rheumatologist Kent Blakely, M.D.  (Tr. 1158.) Examination of her cervical, thoracic, and lumbar spine was within normal limits.  Dr. Blakely noted that Plaintiff did not put forth full effort, and that she was apparently feigning weakness during portions of the testing.  (Tr. 1161.)  On September 30, 2004, Plaintiff was examined by rheumatologist William Palmer, M.D.  (Tr. 1200-01.) Examination showed Plaintiff was "slightly" sullen but pleasant.  She was neurologically intact, and musculoskeletal examination showed no synovitis, but was notable for several tender points.  She had a "normal" curve to the back and could easily flex to 90 degrees.  Her gait and muscle strength were "normal."  Dr. Palmer opined that Plaintiff met the criteria for fibromyalgia, and told her it was "imperative" that she start a regular exercise program to reduce her symptoms.  He also recommended no napping or caffeine during the day.  (Tr. 1201.)

On October 11, 2004, Plaintiff went to Lewiston Birkmann, M.D., who had treated her in the past, with complaints of a new tremor. Examination showed an intermittent "rapid tremor" in her right hand, but no significant tremor in the left hand. Her gait was steady and improved. Dr. Birkmann noted that she no longer had much spasticity, appearance of spasticity, or stiffness. She had "good" upper extremity strength and no significant weakness in the lower extremities. Dr. Birkmann opined that Plaintiff had "mild" spastic paraparesis[2], but it was improved. (Tr. 1229.) Testing also showed that she did not have multiple sclerosis. Dr. Birkmann opined it was possible the tremor was caused by her use of Wellbutrin. (Tr. 1230.)

On November 23, 2004, Plaintiff returned to Dr. Birkmann, at which time her gait had improved even more. Dr. Birkmann still thought the tremor may have been due to Wellbutrin and asked her to discuss reducing or discontinuing that medication with her doctor. (Tr. 1227.)

On December 2, 2004, Plaintiff followed up with Dr. Palmer and reported doing "very little exercise." Dr. Palmer reiterated his plan of treating fibromyalgia with improved sleep, aerobic exercise, and routine stretching. He also added a medication to help her sleep. (Tr. 1219.)

On February 11, 2005, Dr. Palmer completed a Fibromyalgia Physical Capacity Evaluation, in which he opined that Plaintiff could work a competitive eight-hour workday and 40-hour workweek. (Tr. 1205, 1208-09.) He opined that she could sit continuously for more than two hours at a time for a total of at least six hours, and she could stand for one hour continuously for a total of less than two hours. (Tr. 1205.) Dr. Palmer opined Plaintiff would require the option to sit or stand at will. (Tr. 1206.) She could lift and carry up to 50 pounds occasionally and up to 10 pounds

---

[2]Paraparesis is "[w]eakness affecting the lower extremities." *See* Stedman's Medical Dictionary 1313 (27th ed. 2000) ("Stedman's").

9

frequently. (Tr. 1206.) She could repetitively reach, handle, or finger and could twist or bend about 20 percent of the time. (Tr. 1207.) Dr. Palmer opined that Plaintiff would be absent from work about twice a month, and that she would be unable to sustain a "fast" pace of work. (Tr. 1207-08.) He also opined that Plaintiff would "often" suffer pain sufficient to interfere with attention and concentration, and that she would need to walk around for three minutes of every five minutes to relieve discomfort. (Tr. 1204-06.) Dr. Palmer wrote that he did not know Plaintiff well enough to tell whether she was a malingerer. (Tr. 1203.)

On February 28, 2005, Plaintiff told Dr. Birkmann she was still experiencing the tremor but that she had plans to reduce her Wellbutrin dosage. (Tr. 1226.) Dr. Birkmann completed a Physical Capacities Evaluation in which he opined that Plaintiff could only sit, stand, and walk a total of three hours in an eight-hour workday. He opined that Plaintiff could occasionally lift and carry up to 10 pounds, occasionally reach with the right hand or with both hands, seldom grasp or perform fine manipulations, and seldom use foot controls. (Tr. 1213.) Dr. Birkmann also opined that Plaintiff could occasionally reach above shoulder level, seldom bend, and could never squat, crawl, or climb. (Tr. 1214.)

On March 18, 2005, Plaintiff followed up with Dr. Palmer. (Tr. 1218.) Webster reported that she was walking a few times per week, and that she occasionally swam. Dr. Palmer recommended an exercise plan and discussed ways to get more restorative sleep. (Tr. 1218.) Dr. Palmer saw Plaintiff for the last time on July 22, 2005. He noted that she did not exercise, and that she had not really improved. (Tr. 1217.)

On October 13, 2005, examination by Dr. Birkmann showed Plaintiff was alert

and oriented, her neck was "nonrigid," Lhermitte's testing[3] was negative, arm raising was "normal," she had "good" reflexes, and exhibited full muscle strength "when she would give efforts." (Tr. 1223.)

The record also contains assessments from state-agency physicians and psychologists. On May 28, 2004, Linda Schmechel, Ph.D., reviewed the evidence of record and opined that Plaintiff would have "mild" restriction of activities of daily living, "mild" to "moderate" difficulties in maintaining social functioning, "moderate" difficulties maintaining concentration, persistence, or pace, and had had one or two episodes of decompensation of extended duration. (Tr. 1050, 1060.) Dr. Schmechel completed a Mental Residual Functional Capacity Assessment (Tr. 1064) and opined that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out short and simple instructions; sustain an ordinary routine without special supervision; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. She opined that Plaintiff would be "moderately" limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (Tr. 1064-65.) The narrative portion of Dr. Schmechel's evaluation stated, "[Claimant]

---

[3]Lhermitte's sign is the development of "sudden electric-like shocks extending down the spine on flexing the head." *See* Stedman's at 1638.

retains capacity to perform simple, unskilled work" and "[m]emory would be considered borderline—moderately limited but adequate for successful performance of simple, unskilled work." (Tr. 1063.) On November 16, 2004, Patricia Newman, Ph.D., affirmed this opinion, noting that no additional psychiatric evidence had been received. (Tr. 1078.)

On July 5, 2004, Jerry Reed, M.D., reviewed the evidence of record and opined that Plaintiff retained the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; stand about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 1069, 1075.) She could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 1070.) Finally, Dr. Reed opined that Plaintiff should avoid concentrated exposure to environmental limitations such as extreme temperatures, wetness, humidity, noise, fumes, odors, dusts, and hazards. (Tr. 1072.) Based on Dr. Reed's review of the medical evidence, he opined that Plaintiff "has a tendency to exaggerate her symptomatology." (Tr. 1076-77.) On November 16, 2004, A. R. Hohensee, M.D., reviewed the evidence of record and agreed with Dr. Reed's RFC assessment. (Tr. 1079.)

Plaintiff appeared and testified at an administrative hearing held on March 15, 2006. (Tr. 1279-1316.) Plaintiff stated that she was 47 years old, had obtained a general equivalency diploma, and had taken some college courses. (Tr. 1286-87.) She testified that she could not work because sometimes she would need to sit down or lay down during the workday. (Tr. 1289.) Plaintiff testified that Dr. Allison had been her treating doctor since 2003, and he told her she could do a sit-down job. (Tr. 1294.) Plaintiff testified that she could not do a desk job or a sitting job because her hips and knee would "go out." (Tr. 1294.)

Plaintiff estimated she could sit for about 30 minutes at a time, and she alternated sitting and lying down throughout the day. (Tr. 1295-99.) Plaintiff testified that she lived with a male friend, she did the grocery shopping, but someone came in

12

to do the house cleaning.  (Tr. 1289.)  She spent about two hours a day on the internet corresponding with a friend and playing games.  (Tr. 1291.)  She also enjoyed making blankets and pillows and doing word-search puzzles.  (Tr. 1293.)  She visited with a friend on the telephone daily and tried to go for walks when the weather was nice.  (Tr. 1297.)  Plaintiff testified that since her last administrative hearing, she had taken a trip to Oklahoma to see family, which was about a 12-hour drive each way.  (Tr. 1292-93.)

A vocational expert also appeared and testified at the administrative hearing.  (Tr. 1308-15.)  The ALJ posed a hypothetical question to the vocational expert which included an individual of Plaintiff's age, education, and experience who could stand or walk up to two hours in an eight-hour day, sit for six hours in an eight-hour day, and lift and carry up to 10 pounds frequently or occasionally.  (Tr. 1309.)  The individual could occasionally perform postural activities and would need to avoid concentrated exposure to cold, heat, wet, humidity, noise, vibration, fumes, and hazards.  (Tr. 1308-09.)  Furthermore, the individual would require work with a specific vocational preparation of one to two, that is routine and repetitive in nature and could be performed under ordinary supervision, that does not require her to deal with high stress or job changes, and in which social interaction with coworkers, the general public, and supervisors is limited to occasionally (which the ALJ defined as brief or superficial).  (Tr. 1308-09.)  The vocational expert testified that such an individual would not be able to perform any of Plaintiff's past relevant work, but could perform other work, such as sedentary cashier, production assembler, and hand packager.  (Tr. 1310.)  The vocational expert testified that such an individual would "pretty much be able to do the full range of unskilled, sedentary jobs."  (Tr. 1310.)

## V.  ANALYSIS

13

## A.  Plaintiff's Credibility

The ALJ found that Webster's "testimony, insofar as it attempted to establish total disability, was not credible in view of the criteria set forth under 20 CFR 404.1529 and 20 CFR 416.929, Social Security Ruling 96-7p, and Polaski v. Heckler, supra."  (Tr. 42.)  In this appeal, Webster argues that the ALJ "totally failed to comment on how any of the *Polaski* factors influenced her decision," and because the ALJ failed "to produce substantial evidence discrediting the plaintiff's subjective allegations, the testimony must b[e] found to be credible."  (Filing 22, at 5.)  Plaintiff further contends that if I view her subjective claims as credible, the vocational expert's testimony requires me to find that she cannot work for any employer in the national economy.  (*Id.*)

### 1.  Polaski Factors

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and functional restrictions.  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (in evaluating credibility of claimant's subjective complaints, ALJ must consider the above-listed "*Polaski* factors," citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000).

Contrary to Plaintiff's contention, the ALJ is not required to discuss methodically each *Polaski* consideration, so long as the ALJ acknowledges and examines those considerations before discounting the subjective complaints.  *Id.* at 971-72 (citing *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir.1996)).  Here, the ALJ clearly acknowledged and examined the *Polaski* considerations, as her opinion

14

specifically and thoroughly discusses Webster's prior work record; her symptoms (multiple joint pain, depression, anxiety); her physicians' observations regarding her daily activities, hobbies, sleeping patterns, and social contacts; and the medical treatment, medication, and recommended therapy that Webster has used (or refused to use) in an effort to alleviate her symptoms.  (Tr. 32-40.)

### 2.  *Inconsistencies Affecting Credibility*

The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  *Lowe*, 226 F.3d at 972. It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence by making express credibility determinations and setting forth the inconsistencies in the record which cause the ALJ to reject the plaintiff's complaints.  Where adequately explained and supported, credibility findings are for the ALJ to make.  *Masterson v. Barnhart*, 363 F.3d 731, 737-39 (8th Cir. 2004); 20 C.F.R. § 404.1529[4]; SSR 96-7p, 1996 WL

_____

[4] This regulation provides, in part:

Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. . . .  Factors relevant to your symptoms, such as pain, which we will consider include:

   (i) Your daily activities;
   (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
   (iii) Precipitating and aggravating factors;
   (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
   (v) Treatment, other than medication, you receive or have received

374186 (S.S.A. July 2, 1996).[5]

   In concluding that plaintiff Webster's testimony was not credible in this case, the ALJ found Webster's subjective complaints of pain inconsistent with her medical records, her noncompliance with treatment, her work history, and her motivation to work.   (Tr. 14-17, 19-20.)   *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) ("Subjective complaints may be discounted if the evidence as a whole is inconsistent with the claimant's testimony."); *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004) ("We have been careful to explain that an ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances.").

   The ALJ considered evidence that Webster exaggerated her symptoms (Tr. 38), which is a proper factor for the ALJ to consider.   *See Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) ("The ALJ was entitled to draw conclusions about [the claimant's] credibility based on the FCE pain-replication and distraction analyses indicating that [the claimant] was exaggerating symptoms and giving less than his full effort."); *Jones*

_____

for relief of your pain or other symptoms;
   (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
   (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3).

   [5]Among other things, Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."   SSR 96-7p, 1996 WL 374186, at *2 (S.S.A., July 2, 1996).

16

*v. Callahan*, 122 F.3d 1148, 1152 (8ᵗʰ Cir. 1997) (ALJ may properly consider a claimant's exaggeration of his symptoms in evaluating his subjective complaints). For example, Dr. Blakely indicated that Webster did not put forth full effort during testing, and that she was apparently "feigning weakness" during portions of the testing. (Tr. 1161.) Dr. Birch noted that Plaintiff walked with a "funny waddling type gait that varie[d] depending on how well she [was] distracted." (Tr. 1151.) On another occasion Dr. Birkmann noted that Plaintiff was "very dramatic." (Tr. 1238.)

The ALJ also considered that Webster was not compliant with recommended treatment (Tr. 38), which is also a proper factor in the credibility analysis. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (citing *Gowell v. Apfel*, 242 F.3d 793, 797 (8ᵗʰ Cir. 2001)) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility."); *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001). On September 30, 2004, Dr. Palmer, a rheumatologist, evaluated Plaintiff for her complaints of fibromyalgia and told her it was "imperative" that she start a regular exercise program to improve her fibromyalgia symptoms. (Tr. 38, 1201.) As the ALJ noted, Webster did not comply. (Tr. 38, 1217-19.) On December 2, 2004, Plaintiff admitted she was doing "very little" exercise. (Tr. 1219.) In March 2005, Webster reported that she only occasionally walked or swam (Tr. 1218), and when she returned in July 2005, she said she was not exercising at all. (Tr. 1217.) Furthermore, the ALJ considered Dr. Palmer's opinion that Plaintiff could do full-time sedentary work. (Tr. 38, 1205, 1208.)

The ALJ noted that Plaintiff's alleged onset date was not tied to any medical worsening of her condition, but was simply the day after her last unfavorable ALJ decision was issued. (Tr. 38, 902-31, 966.) The ALJ further pointed out that Plaintiff was denied disability benefits after an evidentiary hearing in May 2001, and again in November 2003. (Tr. 38, 877-931.)

The ALJ then considered the positive work assessment completed by Webster's

17

last employer.  (Tr. 38, 1003-06.)  Webster reported that she stopped working in November 1999 due to her medical problems (Tr. 971); however, the employer indicated that Webster successfully performed all of her job functions as a certified nurse aide and that she would be rehired if a position was available (Tr. 1006).  The ALJ properly found that these inconsistencies detracted from the credibility of Webster's subjective complaints.

The ALJ also considered Webster's report that Dr. Allison, Webster's family physician, knew the most about her condition, but had imposed no work or functional restrictions.  (Tr. 38, 1294.)  The ALJ observed that when Dr. Allison evaluated Webster in April 2001, he wrote that he "was very blunt with her with [his] concern that she is actually quite physically healthy [and] should not be attempting to get disability as she is certainly able to perform a job."  (Tr. 38, 1264.)  Although it appears this note may have been written by one of Dr. Allison's colleagues (Tr. 1264), Plaintiff testified at the administrative hearing that Dr. Allison told her she could do a sit-down job.  (Tr. 38, 1294.)  A treating physician's opinion is generally entitled to substantial weight.  *See, e.g., Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996).*

The ALJ noted that when this case was reviewed in July 2004 by Dr. Reed, a state-agency physician, he noted numerous inconsistencies affecting Webster's credibility.  (Tr. 38, 1076-77.)  Dr. Reed observed that while Webster said she could only drive 58 miles, a good portion of her medical care was in another state, requiring her to drive from northern Nebraska to northern Kansas.  (Tr. 38, 997, 1122-1140, 1076-77.)  The ALJ pointed out that Webster alleged visual problems, yet Dr. Reed noted that her vision was essentially normal at "20/20-25" bilaterally.  (Tr. 38-39, 1077.)  Dr. Reed stated, "[o]ne feels that the claimant has a tendency to exaggerate her symptomatology."  (Tr. 39, 1077.)  Dr. Reed stated that a number of Webster's allegedly disabling impairments were not documented, and that there was no evidence that she had rheumatoid arthritis.  (Tr. 1076.)  He specifically noted that Webster's examination by Dr. Birch did not reveal any evidence suggesting rheumatoid arthritis

18

or any active synovitis.  (Tr. 39, 1076.)  Although the ALJ is not bound by findings made by state-agency physicians, such physicians are highly qualified and are also experts in Social Security disability evaluations, requiring the ALJ to consider their findings.  *See* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

Finally, the ALJ considered Webster's allegations of disabling mental impairments.  (Tr. 39.)  The Eighth Circuit has held that the "absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [Plaintiff's] mental capabilities disfavors a finding of disability."  *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000).  *See, e.g., Williams v. Sullivan*, 960 F.2d 86, 89 (8th Cir. 1992) (absence of treatment indicates that a mental impairment is nonsevere).  The ALJ noted that Plaintiff has had no psychiatric treatment, no counseling, and no hospitalizations.  (Tr. 39.)  Indeed, the record in this case shows only that Plaintiff was prescribed psychotropic medications by Dr. Allison, her primary care physician (Tr. 39, 1285), which is not in and of itself evidence of a disabling mental impairment.  *See Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989) (prescription of antidepressant drugs alone does not show that the claimant is disabled).  Thus, the ALJ properly found that this lack of treatment detracted from the credibility of Plaintiff's allegations of disabling depression.

Because the ALJ articulated the inconsistencies upon which she relied in discrediting Plaintiff's testimony regarding her subjective complaints, and because the ALJ's credibility finding is supported by substantial evidence on the record as a whole, the ALJ's credibility finding will be given deference.  *See Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."); *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) ("This case illustrates the importance of our standard of review in social security disability cases.  While there is a significant amount of medical evidence in the record, it appears that substantial evidence would support both the ALJ's conclusion that [the

19

claimaint] was not credible, and [the claimant's] argument to the contrary.  However, the ALJ was able to observe [the claimant] during her testimony at the hearing, and this, in addition to the voluminous medical evidence, convinced the ALJ that she was not fully credible and could perform light work. The ALJ is in the best position to make this determination, *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002), and we cannot say the ALJ erred in doing so.").

## B.  RFC:  Weight Given to Physicians' Limitations & Restrictions

After determining that Webster's subjective complaints of pain and depression were not credible, the ALJ found, among other things, that Webster retained the functional capacity to stand or walk up to two hours in an eight-hour day, sit for six hours in an eight-hour day, and lift and carry up to 10 pounds frequently or occasionally.  The vocational expert then testified that such an individual would not be able to perform any of Plaintiff's past relevant work, but could perform other work, such as sedentary cashier, production assembler, or hand packager.  (Tr. 1310.)  The vocational expert testified that such an individual would "pretty much be able to do the full range of unskilled, sedentary jobs."  (Tr. 1310.)

RFC, or "residual functional capacity," is what the claimant is able to do despite limitations caused by all of the claimant's impairments.  *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, the RFC is a medical question.  *Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001). Thus, some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.  *Id.* at 704.  "'An administrative law judge may not draw upon his own inferences from medical reports.'"  *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (quoting *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)).

20

### *1.  Failure to Assign Controlling Weight to Treating Physicians*

Webster asserts that the ALJ erred in failing to assign controlling or "the greatest weight" to the opinions of her treating physicians, Drs. Birkmann and Palmer, in making an RFC assessment.  If this testimony had been given controlling or significant weight, argues Webster, then the testimony of the vocational expert would have required a finding that she could neither perform her past relevant work, nor any other work in the national economy.

### *a.  Dr. Birkmann*

As noted above, Dr. Birkmann evaluated Webster's physical capacity and opined that she could only sit, stand, and walk a total of three hours in an eight-hour workday;  could occasionally lift and carry up to 10 pounds, occasionally reach with the right hand or with both hands, seldom grasp or perform fine manipulations, and seldom use foot controls; and could occasionally reach above shoulder level, seldom bend, and could never squat, crawl, or climb.  (Tr. 1214.)

Webster complains that in arriving at her RFC, the ALJ rejected the opinions of Dr. Birkmann for several reasons, "none of which are based on what any other doctor said about the opinions of Dr. Birkmann." (Filing 16, at 31.) Webster submits that "[t]he ALJ relied on no medical opinions as a basis for her rejection of the significant limitations identified by Dr. Birkmann[,] only to say that they were contrary to the 'great weight of the objective medical evidence that preceded his report' without identifying even one such contrary medical findings [sic]." (*Id.* at 33-34.)  Instead, Webster argues, the ALJ "substitute[d] her medical opinions for those of the treating neurologist," "reject[ed] unrebutted evidence," and "interpret[ed] raw medical data."  (*Id.* at 31 & 33.)

The ALJ's "notice of the determination or decision must contain specific

21

reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). *See also* 20 C.F.R. § 404.1527(d) (Aug. 1, 2006) (factors to be considered in evaluating medical opinions when controlling weight not given; "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). A treating physician's opinion on the nature and severity of a claimant's impairment will only be given "controlling weight" when the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ properly found Dr. Birkmann's opinion was not entitled to any weight or consideration because it was not supported by his own treatment notes and was also inconsistent with the other evidence of record, including the clinical findings of Dr. Palmer and Dr. Birch. (Tr. 35.) The ALJ may discount any treating physician's opinion which is "inconsistent with the record as a whole." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007). *See also Goff v. Barnhart*, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion.").

First, the ALJ correctly found that Dr. Birkmann provided no specific clinical or laboratory findings to support his opinion. (Tr. 35, 1213-15.) A treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). *See also Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (the fact that a treating physician's RFC assessment is in checklist format or consists of only vague, conclusory statements may limit its evidentiary value). Dr. Birkmann stated that he had treated Plaintiff on a "regular basis" since January 14, 2002 (Tr. 1210), yet the

ALJ noted that the record contained no evidence of any examination or treatment from November 27, 2003—her alleged onset date of disability—until almost a year later on October 11, 2004. (Tr. 35, 1229.)

The ALJ also found inconsistencies between the findings in Dr. Birkmann's treatment notes and the limitations contained in his opinion. (Tr. 35.) For example, on October 11, 2004, Dr. Birkmann found no evidence of a significant tremor involving Plaintiff's left hand, yet he opined that Plaintiff could "seldomly" use that hand for reaching, grasping, or fine manipulation. (Tr. 35, 1213, 1229.) Examination on that date also showed Plaintiff had "good" muscle strength in her upper and lower extremities, and her gait was "steady and improved" without much appearance of stiffness or spasticity. (Tr. 35, 1229.) Dr. Birkmann opined that Plaintiff's spastic paraparesis was improved and was only "mild," in contrast to his opinion on the RFC form that it was disabling. (Tr. 1210, 1229.) At his examination on November 23, 2004, Dr. Birkmann noted that Plaintiff's gait had improved even more, and that the "slight" tightness of her gait could be a form of "*slight* 'primary lateral sclerosis.'" (Tr. 1227 (emphasis added).) Yet, in his opinion, Dr. Birkmann opined that Plaintiff had "*disabling*" primary lateral sclerosis. (Tr. 1210 (emphasis added).) Finally, examination showed only a "mild" essential tremor in Plaintiff's left hand that Dr. Birkmann noted was possibly a side effect of Wellbutrin. (Tr. 35, 1227.)

The ALJ also found the extreme limitations in Dr. Birkmann's opinions were contrary to the great weight of the objective medical evidence which preceded his opinion, including the findings of Dr. Palmer, a rheumatologist, and Dr. Birch, a consultative examiner. (Tr. 35.)

As discussed in more detail above, Dr. Palmer's examination on September 30, 2004, showed Plaintiff was neurologically intact without synovitis. She did have some fibromyalgia tender points, but she could "easily" flex her back to 90 degrees, and her gait and muscle strength were "normal." Dr. Palmer opined that Plaintiff met

23

the criteria to be diagnosed with fibromyalgia, but she could improve her symptoms by regular exercise and eliminating napping and caffeine during the day. (Tr. 34-35, 1201.) Contrary to Dr. Birkmann's assessment of Webster's physical capacity, on February 5, 2005, Dr. Palmer opined that Plaintiff could perform full-time work activity. (Tr. 34, 1205, 1208.)

Similarly, and as explained in detail by the ALJ, Dr. Birch's April 29, 2004, examination of Plaintiff's wrists, elbows, shoulders, hips, knees, and ankles were all "normal." (Tr. 35, 1151.) Her joints showed no evidence of active rheumatoid arthritis or synovitis, and Dr. Birch opined that there was no evidence to support a finding of any past history of rheumatoid arthritis. Further, Dr. Birch found that although Plaintiff did have some fibromyalgia symptoms, there were no objective findings at that time. (Tr. 35, 1151.) Dr. Birch also found that Plaintiff's "funny waddling type gait . . . varie[d] depending on how well she [was] distracted." (Tr. 35, 1151.) Unlike Dr. Birkmann's finding that Plaintiff could never squat, crawl, or climb, Dr. Birch found that Plaintiff's heel and toe walking was "fair," her ability to squat was "fair," she was able to get on and off of the examination table, straight-leg-raise testing was negative, and she had an essentially full range of motion in all joints. (Tr. 35, 1151-54.)

At times Plaintiff developed "unusual shaking" or twisting in various parts of her body, but Dr. Birch opined that it was not consistent with any organic tremor or seizure problem and was more likely psychological in nature. (Tr. 35, 1150.) Contrary to Dr. Birkmann's finding that Webster could seldom grasp or perform fine manipulations, Dr. Birch found that Webster's grip strength was "3/5," her pincer strength was "excellent," and she was able to normally manipulate coins. (Tr. 1151.) Finally, Dr. Birch opined that her tremor was likely caused by anxiety rather than a physical cause. (Tr. 35, 1152.)

Because of the lack of clinical or laboratory findings which would support Dr.

24

Birkmann's opinion regarding the plaintiff's functional limitations, as well as the contrary clinical findings by examining medical specialists—all of which were thoroughly discussed by the ALJ—the ALJ properly found that Dr. Birkmann's opinion was not supported by the other objective evidence of record.

### b.  Dr. Palmer

The plaintiff contends the ALJ stated her RFC assessment was "supported by Dr. Palmer's February 5, 2005 assessment of Claimant's functional capacities," but the ALJ did not specifically state the amount of weight she gave to Dr. Palmer's opinions and the reason for such weight.  The plaintiff correctly notes that when the vocational expert was asked a hypothetical question that incorporated some of the limitations found by Dr. Palmer, the vocational expert opined that such a person would be unable to perform the plaintiff's past relevant work *or any other work in the national economy*.  (Tr. 1314-1315.)  Thus, Plaintiff argues, if controlling weight was given to Dr. Palmer's opinion, the ALJ should necessarily have decided that Webster was disabled.

In concluding that a person would not be able to perform "any other work in the national economy," the vocational expert keyed on Dr. Palmer's limitations (Tr. 1204-06) that the individual "often" experienced sufficient pain to interfere with attention and concentration *and* the person was required to shift positions every five minutes for three minutes at a time.[6]  (Tr. 1315.)  In evaluating plaintiff Webster's RFC, the

---

[6]     Q. . . . Second hypothetical question, if you were to take somebody the same age as the Claimant with . . . the limitations identified by Dr. Palmer . . . that such a person . . . would need to be able to shift positions . . . about every five minutes for about three minutes at a time, and . . . would often have sufficient pain to interfere with attention and concentration. . . . .  Would such a person be able to do any other work in the national economy?
        A.  The one part of the hypothetical often would affect her ability to function because of the pain.  And you said shifting positions about every two to three

ALJ did not include either of these limitations, clearly because the latter limitation was inconsistent with other substantial evidence in the record.  (Tr. 39.)

Specifically, Dr. Palmer's physical capacity evaluation was internally inconsistent regarding the "shifting-position" limitation that the ALJ did not include in her RFC.  Dr. Palmer's evaluation stated that every five minutes, for three minutes at a time, Webster needed to "include periods of walking around during an 8 hour working day."  (Tr. 1205-06.)  This would mean Webster could only remain seated for two minutes at a time throughout her workday.  In marked contrast, Dr. Palmer opined *in the same evaluation* that Webster could continuously sit at one time for "[m]ore than 2 [h]ours," and could sit for a total of "at least 6 hours" in an 8-hour workday.  (Tr. 1205.)  Webster herself testified that she could sit "30 minutes at a time."  (Tr. 1295.)

Clearly, the ALJ did not include all of Dr. Palmer's limitations in her RFC because they were not credible in light of other substantial evidence contained in, among other places, *his own* evaluation and in the plaintiff's own testimony.  In formulating a RFC, the ALJ need only include those limitations which she found to be credible.  *Lacroix v. Barnhart*, 465 F.3d 881, 887-88 (8th Cir. 2006) (citing *Garza v. Barnhart*, 397 F.3d 1087, 1088 (8th Cir. 2005)); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (ALJ need not give controlling weight to treating physician's RFC assessment that is inconsistent with other substantial evidence in the record; *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) ("The ALJ may . . . disregard [a treating physician's] opinion if . . . the treating physician has offered

---

minutes, correct?

      Q.  Five minutes for about three minutes at a time, so yeah.  For about every five minutes is what it would be.

      A.  About every five minutes.  Okay.  No.

(Tr. 1315.)

26

inconsistent opinions."); *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994); *Graves v. Social Security Admin.*, 2009 WL 205055, at *10 (D. Neb. Jan. 26, 2009) (because some of examining physician's opinions were contradicted by record, ALJ did not err by failing to adopt those portions of the opinion in full).

Because the ALJ properly rejected the "shifting-position" limitation that was pivotal in the vocational expert's conclusion that a hypothetical plaintiff with that limitation could not perform any work in the national economy, the ALJ was not bound to conclude that Webster could not perform any work in the national economy.

As far as the weight given to Dr. Palmer's opinions, the ALJ discussed Dr. Palmer's opinions in summarizing the medical evidence and in evaluating the credibility of Plaintiff, as well as incorporated some—but not all—of Dr. Palmer's limitations in her RFC.  (Tr. 34-35, 39.)  Obviously, while the ALJ did not assign controlling weight to Dr. Palmer's opinions, she thoroughly considered and discussed them and assigned significant weight to those opinions.  *See Choate v. Barnhart*, 457 F.3d 865, 869-70 (8th Cir. 2006) (ALJ's determination that plaintiff was limited to walking or sitting for six hours in eight-hour work day and could perform light work only in certain environments constituted "significant limitations, demonstrating that the ALJ gave some credit to the opinions of the treating physicians where the opinions were supported by the objective medical evidence"); *Petersen v. Barnhart*, 2004 WL 2187565 at *8 (D. Neb. Sept. 27, 2004) (ALJ not obligated to accept physician's opinion when medical evidence in record did not support opinion; when it was apparent that ALJ "clearly discounted [the doctor's opinion] as not supported by other medical evidence in the record," ALJ need not explicitly state the weight assigned to physician's opinion).

Because the ALJ's reliance on some, but not all, of Dr. Palmer's opinions was appropriate and consistent with substantial evidence in the record, the ALJ's alleged failure to more explicitly discuss those opinions is at most an arguable deficiency in

opinion-writing and not grounds for remand.  *See Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (deficient opinion-writing not sufficient reason to set aside ALJ's finding where deficiency has no practical effect on outcome); *Johnson v. Apfel*, 240 F.3d 1145, 1149 (8th Cir. 2001) ("Any arguable deficiency . . . in the ALJ's opinion-writing technique does not require this Court to set aside a finding that is supported by substantial evidence.").

## 2.  Failure to Either Adopt or Properly Discredit Consultant's Opinion

The ALJ made a specific RFC finding that the plaintiff "is limited to low stress work that involves only brief and superficial interaction with others including the general public." (Tr. 42.)  In reaching and explaining this conclusion, the ALJ stated that "[f]rom a mental standpoint, claimant has no counseling, no psychiatric treatment, and no hospitalizations.  The undersigned agrees with the detailed analysis by DDS at exhibit C2f," which is the psychiatric review and mental residual functional capacity assessment by Linda Schmechel, Ph.D.  (Tr. 39, 1050-1067.)  The ALJ described her conclusions as "essentially consistent" with those of Dr. Schmechel. (Tr. 39.)

On appeal, the plaintiff points out that Dr. Schmechel's mental residual functional capacity assessment found that Webster was "moderately limited" in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting.  (Tr. 1064-65.)  Further, Dr. Schmechel assessed Webster as mild to

28

moderately limited in her ability to maintain social functioning and moderately limited in her ability to maintain concentration, persistence, or pace.  (Tr. 1060.)

When asked by the plaintiff's attorney at the administrative hearing whether inclusion of these additional limitations contained in Dr. Schmechel's assessment would affect the vocational expert's conclusions regarding available work in the national economy, the vocational expert stated, "I'd say with that degree of moderates that all impact upon regular work behaviors, such a person would be able to get a job, *but probably wouldn't be able to sustain it*."  (Tr. 1314 (emphasis added).)

While the ALJ's opinion purports to agree with Dr. Schmechel's report and contends that her conclusions are "essentially consistent" therewith, the ALJ's RFC only explicitly incorporates Dr. Schmechel's narrative finding that the claimant needs a low stress level and *one* of Dr. Schmechel's findings that the plaintiff is moderately limited in her ability to interact appropriately with the general public.  The ALJ's opinion purports to "agree[] with the detailed analysis" in Dr. Schmechel's findings, but does not adopt the conclusion of the vocational expert who, when asked to consider *all* of Dr. Schmechel's findings regarding how Webster is "moderately limited," opined that there would be no sustainable work available in the national economy for someone with those limitations.

Plaintiff Webster asserts that if the ALJ really agreed with Dr. Schmechel, as stated in her opinion, the ALJ erred by failing to include the consultant's limitations in the hypothetical question posed to the vocational expert; conversely, if the ALJ did *not* find Dr. Schmechel's limitations credible or supported by the record, the ALJ did not properly discredit the consultant.  I agree.

The ALJ is required to consider the findings made by state-agency physicians and psychologists.  *See* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) (ALJs not bound by findings of state-agency or program medical and psychological consultants,

but such findings must be considered, and weight assigned to such findings must be explained in ALJ's decision); SSR 96-6P, 1996 WL 374180 (S.S.A. July 2, 1996) (ALJs may not ignore expert opinion evidence of state-agency and program medical and psychological consultants and "must explain the weight given to these opinions in their decisions").

Unlike the ALJ's discussion of Dr. Palmer's opinion, it is not clear from the ALJ's limited reference to Dr. Schmechel's report whether the ALJ actually considered Dr. Schmechel's opinions in their entirety and what weight, if any, the ALJ placed on those opinions. While the ALJ's opinion states that she "agrees with the detailed analysis" by Dr. Schmechel and reaches conclusions that are "essentially consistent" therewith, it is not apparent how that is so when (1) the vocational expert testified that someone with all of the "moderate" limitations found by Dr. Schmechel would not be able to sustain any work in the national economy, but (2) the ALJ found that Webster "possesses the residual functional capacity for other work that exists in the regional economy in significant numbers." (Tr. 42.)

This discrepancy cannot be characterized as mere "deficient opinion-writing"; rather, it constitutes incomplete analysis that must be explained, as it is directly relevant to the ALJ's ultimate finding that Webster is not disabled. *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (when ALJ implicitly relied on RFC assessment by nonexamining state medical consultant, ALJ was required to explain weight given to opinions of consultant in order to comply with federal regulations and to assist appellate court in reviewing decision below); *Draper*, 425 F.3d at 1130 (while deficient opinion-writing is not sufficient reason to set aside ALJ's finding where deficiency has no practical effect on outcome, "incomplete analyses . . . can serve as a basis for remand").

In addition to the ALJ's failure to adequately address Dr. Schmechel's findings and the weight assigned thereto, the ALJ's hypothetical question to the vocational

expert necessitates remand.  A VE's assessment of whether jobs exist for a claimant cannot be based on a hypothetical question that does not accurately characterize a claimant's condition, including limitations on the claimant's ability to function.  *Howe v. Astrue*, 499 F.3d 835, 841-42 (8th Cir. 2007).  If the ALJ in this case genuinely "agree[d] with the detailed analysis" provided by Dr. Schmechel (as stated in the ALJ's opinion) and if the ALJ's conclusions actually were "essentially consistent" with those of Dr. Schmechel (as stated in the ALJ's opinion), then the ALJ was bound to include in her hypothetical question to the VE all of the impairments noted by Dr. Schmechel.  *Id.* at 842 (unless hypothetical question comprehensively describes limitations on claimant's ability to function, VE will be unable to accurately assess whether jobs exist for claimant; hypothetical must include impairments that are supported by record and "that the ALJ accepts as valid").

While it would have been permissible for the ALJ to omit limitations from her hypothetical questions to the VE that she found not credible (and to explain in her opinion why she found those limitations not supportable), *Harvey v. Barnhart*, 368 F.3d 1013, 1016-17 (8th Cir. 2004) (proper to omit from hypothetical questions to VE information the ALJ finds to be non-credible), the ALJ's opinion here  indicates that she "agree[d]" with Dr. Schmechel's limitations and found Schmechel's opinions "consistent" with her own.  In those circumstances, the ALJ was not free to omit those work-related restrictions from her hypothetical question to the VE, especially when the VE testified in response to Plaintiff's counsel's questions that application of those limitations to Webster would require a finding of disability.

In the absence of testimony elicited by a proper hypothetical question, I cannot say the Commissioner successfully demonstrated Webster's ability to perform jobs in the national economy, or that the ALJ's determination that Webster was not disabled is supported by substantial evidence on the record as a whole.  *Howe*, 499 F.3d at 842.  Therefore, I must remand this matter to the Commissioner.

31

## VI.  CONCLUSION

The ALJ erred by failing to adequately address the findings of Linda Schmechel, Ph.D., contained in her Mental Residual Functional Capacity Assessment and the weight assigned thereto.  This matter shall be remanded to the Commissioner to allow the ALJ to do so.  If the ALJ finds the limitations in Dr. Schemechel's assessment to be credible and applicable to the plaintiff, then the ALJ will need to reevaluate the testimony of the vocational expert that application of those limitations to the plaintiff would prevent her from sustaining any work in the national economy, thereby requiring a finding of disability.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document, providing that the Commissioner's decision is reversed and the cause remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

DATED this 19th day of June, 2009.

BY THE COURT:
s/ *Richard G. Kopf*
United States District Judge

32